NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2771-13T3

C.J.R., a minor, by his
father and guardian ad litem,
CHRISTOPHER REES, and
CHRISTOPHER REES, individually,

| APPROVED FOR PUBLICATION |
| --- |
| December 8, 2014 |
| APPELLATE DIVISION |

    Plaintiffs-Appellants,

v.

G.A.,

    Defendant-Respondent,

and

GERALD J. ALESSI,

    Defendant.

_____

Argued November 17, 2014 - Decided December 8, 2014

Before Judges Sabatino, Simonelli, and Guadagno.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0576-12.

John D. Borbi argued the cause for appellants (Borbi, Clancy & Patrizi, attorneys; Mr. Borbi, on the brief).

Ann L. Longo argued the cause for respondent (Naulty, Scaricamazza & McDevitt, LLC, attorneys; Gerald X. Smith, of counsel and on the brief; Ms. Longo, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

With his Medford youth lacrosse team in the lead, less than twenty seconds remaining on the game clock, and the ball nestled in the basket of his stick, a Medford player was struck in the forearm by an opposing player on the Marlton team. The blow knocked the Medford player to the ground. Referees whistled play to a halt and ended the game. The Medford player was taken to a hospital, where he was treated for a fracture.

Seeking to recover damages for his personal injuries, the Medford player, a minor, and his father filed suit in the Law Division against the opposing player, who was eleven years old at the time of the incident. Plaintiffs also named the Marlton player's father as a co-defendant. The trial court granted summary judgment to both defendants. The court concluded that the facts relating to the conduct producing this youth sports injury, even when viewed in a light most favorable to plaintiffs, were insufficient to support this cause of action. Plaintiffs now appeal, solely challenging the dismissal of their claims against the other minor.

We affirm the entry of summary judgment in this case of first impression under New Jersey law. We concur with the motion judge that the defendant minor breached no legal duty in

causing the plaintiff minor to sustain this unfortunate sports-related injury.

We reach our conclusion by applying a double-layered analysis, one which counsel on appeal mutually accepted as an appropriate distillation of the relevant tort principles separately pertaining to adult sporting activities and to the conduct of minors. The inquiry we have fashioned examines: (1) whether the opposing player's injurious conduct would be actionable if it were committed by an adult, based on sufficient proof of the defendant's intent or recklessness as required by the Supreme Court's case law; and, if so, (2) whether it would be reasonable in the particular youth sports setting to expect a minor of the same age and characteristics as defendant to refrain from the injurious physical contact.

For the reasons we explain in this opinion, the record in this case reflects that, at the very least, the second query must be answered here in the negative. Summary judgment was therefore appropriately granted to the defendant minor.

I.

The facts presented to us are not complicated. We derive them substantially from the deposition testimony of plaintiff

C.J.R.,[1] his parents, and his team's coach.[2] We consider those facts in a light most favorable to plaintiffs. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also W.J.A. v. D.A., 210 N.J. 229, 237 (2012) (applying the same standard on appeal of a summary judgment order).

In 2011, C.J.R. and defendant G.A. were each enrolled by their respective parents in a recreational lacrosse league. At the time of the game incident in question, C.J.R. was twelve years old and G.A. was eleven years old. G.A. was five feet tall and weighed seventy-six pounds. C.J.R. was two to four inches taller and about fourteen pounds heavier than G.A.

Based on their relative skill levels, C.J.R. and G.A. were assigned to the league's "5/6 combination" division, which was a level composed of youths who were not assigned to either the sixth grade "A" teams or the fifth grade "A" teams. As C.J.R.'s coach Brian Bennett explained in his testimony, the "5/6 combination" level essentially involved what is commonly known as a "B" team level, meaning that the skill sets of the players

---

[1] We have elected to use initials for the plaintiff minor ("C.J.R.") and the defendant minor ("G.A."). The record does not provide a middle initial for G.A.

[2] No depositions were taken of any other parties or witnesses, including the defendant minor, the defendant minor's parents, the opposing coach, the referees, or any spectators.

in that division generally were not as advanced as those who were on the "A" teams. C.J.R. played for the Medford team and G.A. played for the Marlton team.

The physical contact between G.A. and C.J.R. occurred near the end of a game on May 7, 2011. The Medford team was in the lead.[3] C.J.R. received the ball at midfield with less than twenty seconds left on the game clock. As described by Coach Bennett, C.J.R. began running towards the sideline. According to Bennett, C.J.R. was trying to keep possession of the ball and maintain the lead until time expired.

As described by C.J.R.'s mother,[4] who had been watching from the sidelines, G.A. was running "full force" diagonally across the field towards C.J.R. As she phrased it, G.A. was also "roaring" unintelligibly. She observed that G.A. had his head "tucked down," with his arms at his side. C.J.R.'s mother did not see the moment of the ensuing collision of the two boys

---

[3] At the motion argument in the trial court counsel for both parties agreed that the score was then 5-4, consistent with defendant's interrogatory answers. C.J.R.'s mother vaguely asserted at her deposition that C.J.R.'s team was "up by several points," but that is not corroborated or substantiated.

[4] C.J.R.'s father did not attend the game.

because she had averted her attention to pick up some empty cups on the sideline.[5]

Coach Bennett also observed G.A. approach C.J.R. According to Bennett, G.A. "left his feet" and "hit [C.J.R.] with either his helmet or his stick right across the midsection." As Bennett recalled it, G.A. had both hands on his stick. Bennett observed that G.A. simultaneously hit not only the back[6] of C.J.R.'s torso but also C.J.R.'s left arm, because C.J.R. had been "rocking his stick" and "twisting."

According to Bennett, upon impact, C.J.R. left his feet and immediately went to the ground. G.A. "bounced off" C.J.R. and also went to the ground. C.J.R. then got back up and began to take off his gloves to "see how [his] arm was, [discovering] it was broken." C.J.R. was conscious the entire time.

Up until that point in the game, C.J.R. had no interactions with G.A. that he could remember. Indeed, according to C.J.R., he had no idea who G.A. was prior to their collision. He could

---

[5] C.J.R.'s mother was a parent designated to pick up cups and debris left on the sidelines that day.

[6] In his own deposition, C.J.R. recalled that G.A. had approached him from the front, not the back. Given our obligation to consider the record in a light most favorable to plaintiffs, we ignore this discrepancy and accept the contrary testimony that G.A. had approached C.J.R. from the rear.

A-2771-13T3

only recall that G.A. was wearing an orange jersey bearing the number thirty-six.

Following the collision, the two referees threw down penalty flags. G.A. was escorted off the field, and an ambulance was called for C.J.R. Soon thereafter, the referees declared the game over, allegedly without explaining why, even though about seven seconds were left on the game clock.[7] No penalty was called or imposed.

An ambulance arrived at the field, and C.J.R. was brought to a local emergency room. He underwent an open reduction surgery to repair his left arm the same day. According to plaintiffs' medical expert, C.J.R. had "both bones of forearm fracture treated with intramedullary rodding of the radius."

C.J.R.'s forearm was kept in a long-arm cast for several weeks, and thereafter in a short-arm cast. He missed about a week to ten days of school but, according to C.J.R.'s deposition testimony, he was otherwise unaffected. The surgery left him with a four-centimeter scar. In addition, C.J.R. claims that his

---

[7] In a signed statement, Coach Bennett suggested that the reason the referees terminated the game was due to a "Warrior Lacrosse" rule, a copy of which is contained in plaintiffs' appendix. As is relevant here, the rule provides that "[o]fficials will have authority to terminate a boys' youth game in response to flagrant acts of unsportsmanlike behavior including excessively rough play[.]"

forearm periodically aches. His doctor notes that he has some residual difficulties with flexion and dorsiflexion, which particularly affect him when wrestling.

Subsequently, C.J.R.'s father Christopher Rees filed a personal injury action on C.J.R.'s and his own behalf in the Law Division, naming as defendants G.A. and G.A.'s father, Gerald Alessi. As to G.A., the complaint alleged that he "acted negligently and impacted with [C.J.R.] during the course and play of the lacrosse game, so as to cause [C.J.R.] injury." Plaintiffs subsequently amplified their claims against G.A., contending that the defendant minor had been "reckless" and thereby would be liable under tort liability principles established by the Supreme Court in adult sport-related contexts. See, e.g., Schick v. Ferolito, 167 N.J. 7 (2001); Crawn v. Campo, 136 N.J. 494 (1994). G.A.'s father, meanwhile, was claimed to be liable for C.J.R.'s injury under a theory of negligent parental supervision.

Defendants moved for summary judgment. The trial court granted summary judgment to G.A.'s father, a ruling which plaintiffs have not appealed.[8] However, the court denied the

---

[8] The father's dismissal was consistent with principles of law that restrict a parent's liability for injuries inflicted by his or her child to limited circumstances in which the parent "knows or has reason to know that he has the ability to control his
(continued)

A-2771-13T3

motion as to G.A. without prejudice, allowing plaintiffs to take additional depositions. When those depositions were completed, G.A. renewed his motion, and plaintiffs filed opposition. Among other things, plaintiffs stressed that G.A. had violated the rules of the game by approaching C.J.R. in a blind-side manner from the rear, leaving his feet with his arms down, and engaging in what is known as a disallowed "take-out check."[9]

Based on the record after fuller discovery had been completed, the motion judge, Judge Marc M. Baldwin, granted summary judgment to G.A. and dismissed plaintiffs' claims against that minor. In his oral ruling, Judge Baldwin concluded that plaintiffs had failed to create a genuine issue of material fact to establish that G.A. had engaged in a reckless form of conduct of a degree or nature sufficient to justify imposing

---

(continued)
child" and also "knows or should know of the necessity and opportunity for exercising such control." Mazzilli v. Selger, 13 N.J. 296, 302 (1953); see also Buono v. Scalia, 179 N.J. 131, 143 (2004) (noting the scope of a parent's immunity from tort liability as to his or her conduct implicating "legitimate child-rearing issues"). Here, the record is bereft of evidence that G.A.'s father had the capacity to control his son's on-the-field conduct during the lacrosse game, let alone proof that the father knew or should have known that he possessed such control and that it was necessary to exercise it.

[9] According to the rules of the game reproduced in plaintiffs' appendix, a "take-out check" is defined as "any body check in which the player lowers his head or shoulder with the force and intent to put the other player on the ground."

liability upon a minor of his age in this sports-related setting.

The judge indicated that G.A.'s age was "critical" to his analysis. The judge noted that he might have denied the motion if, hypothetically, G.A. had been seventeen years old at the time of the incident and had a more mature understanding of the consequences of his behavior. However, given that G.A. was much younger than that at the time of the game, the judge ruled that he had not acted with the level of recklessness required under the law to create liability.

Plaintiffs moved for reconsideration, clarifying for the court that G.A. was eleven years old at the time of the incident, and not age ten as had been suggested at the prior motion argument. The court denied the motion, finding the one-year difference in age inconsequential. This appeal followed.

II.

To date, there are no reported opinions in our State analyzing the alleged tort liability of a minor who inflicts an injury upon another minor while they are participating in a youth sports activity. Two distinct strands of the law guide our analysis: (1) the cases establishing the liability of adults who intentionally or recklessly injure another person in a sporting activity; and (2) the cases that limit the potential

tort liability of minors, depending upon their age and other characteristics.

A.

Our Supreme Court has issued two seminal opinions explicating the standards for tort liability of adults who injure others while engaging in a sporting activity: Crawn, supra, 136 N.J. at 494, and Schick, supra, 167 N.J. at 7.

The plaintiff's complaint in Crawn concerned injuries arising from a defendant crashing into a plaintiff at home plate during an adult "pickup softball game." Crawn, supra, 136 N.J. at 496-99. After canvassing the relevant law of various other jurisdictions, the Court adopted a standard that requires a plaintiff to demonstrate a defendant's intentional infliction of injury or recklessness in order to establish tort liability in the context of recreational sports. Id. at 501-08. As the Court recognized in Crawn, "[p]hysical contact is an inherent or integral part of the game in many sports." Id. at 504. "In addition, the physicality of sports is accompanied by a high level of emotional intensity." Ibid. Consequently, the Court imposed a high burden on plaintiffs seeking tort recovery for injuries they sustain as mutual participants in adult sporting events. "The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and

11

the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms." Id. at 508.

The Court reaffirmed and applied these tenets in Schick, a case in which the plaintiff, a golfer on a course, was injured after being hit in the head by another golfer's errant tee shot. Schick, supra, 167 N.J. at 11-13. In determining that summary judgment was inappropriate, the Court relied on several key facts that could show defendant's "disregard of a high and excessive degree of danger." Id. at 19. Specifically, the Court noted that the defendant had waved the plaintiff off in an effort to induce him to move from his location in proximity to the tee box, and that the defendant then hit his tee shot anyway without assuring that the plaintiff had moved safely out of the way. Id. at 21.

As the Court ruled in Schick, this tee-box scenario presented "a set of facts that a jury could find constitutes reckless conduct because it may reflect a conscious choice of a course of action with knowledge or reason to know that the action will create serious danger to others." Ibid. (emphasis added). The Court elaborated on the meaning of this "recklessness" standard in the sports context:

> an actor acts recklessly when he or she intentionally commits an act of an

> unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. The standard is objective and may be proven by showing that a defendant proceeded in disregard of a high and excessive degree of danger either known to him or her or apparent to a reasonable person in his or her position. Reckless conduct is an extreme departure from ordinary care, in a situation in which a high degree of danger is apparent. Reckless behavior must be more than any mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention[.]
>
> [Id. at 19 (emphasis added) (citations and internal alterations omitted) (quoting Prosser & Keeton on the Law of Torts, § 34 at 212 (5th ed. 1984)).]

So defined, this recklessness standard of care "has been applied in New Jersey to sporting environments that span team competitions, one-on-one competitions, and individualized sporting endeavors." Id. at 14.

                                    B.

The second strand of precedent that must be considered in this youth sports injury context is the law generally governing the potential tort liabilities of minors. In New Jersey, children under the age of seven are protected by a rebuttable presumption that they are incapable of negligence. See Bush v. N.J. & N.Y. Transit Co., 30 N.J. 345, 358 (1959); see also

13                                          A-2771-13T3

Berberian v. Lynn, 179 N.J. 290, 298 (2004) (noting that long-standing presumption). Above this seven-year-old line of demarcation, our law applies a fact-sensitive and context-specific approach, examining the age and other characteristics of the defendant minor, and the surrounding circumstances.

As the Supreme Court has instructed, "a child's conduct should be measured in light of his or her capacity to exercise care under all attendant circumstances." Berberian, supra, 179 N.J. at 298 (citing Cowan v. Doering, 111 N.J. 451, 459 (1988)). Underpinning this modified standard for minors is the notion that "the younger the child, the greater the risk, for younger children are less able -- and less likely -- to discern danger." Jerkins v. Anderson, 191 N.J. 285, 295 (2007) (citing Bush, supra, 30 N.J. at 355).

In this regard, the Court has observed that "'[c]hildren have a known proclivity to act impulsively without thought of the possibilities of danger,' and '[i]t is precisely th[at] lack of mature judgment which makes supervision so vital.'" Id. at 296-97 (quoting Titus v. Lindberg, 49 N.J. 66, 75 (1967) (alterations in original)).

This restrictive approach to the liability or comparative fault of children is further reinforced in the current model

civil jury charges applicable to minors who are seven years and older. As the charges explain:

> [a] child, old enough to be capable of negligence, is required to act with the same amount of care as children of similar age, judgment and experience. In order for you to determine whether a child has acted negligently, <u>you should take into consideration the child's age, intelligence and experience. Also you must consider the child's capacity to understand and avoid the danger to which he/she was exposed in the actual circumstances and situation in this case</u>. You, the jury, must decide the factual question of whether this child was comparatively negligent.
>
> [<u>Current N.J. Model Jury Charges (Civil)</u> § 7.11(A) (1991) (emphasis added).]

Although the model charge refers to concepts of a child's "negligence" rather than his or her "recklessness," we discern no reason to apply a different approach when deciding if a given set of facts satisfies the latter standard of conduct. In each instance, one must consider the child's age, characteristics, and the surrounding circumstances.

We now consider the interplay between the recklessness standard applied in adult sports injury cases and the standards governing child tort liability. The closest published case on point in our state is <u>Calhanas v. South Amboy Roller Rink</u>, 292 <u>N.J. Super.</u> 513, 522 (App. Div. 1996). In <u>Calhanas</u>, the adult plaintiff was skating at a roller rink when he was cut off by a

zig-zagging child skater and thereafter sustained injuries. <u>Id.</u> at 516-17. In determining whether the trial court's grant of summary judgment for the defendant roller rink was appropriate, we were called upon to interpret certain portions of the New Jersey Roller Skating Rink Safety and Fair Liability Act, <u>N.J.S.A.</u> 5:14-1 to -7.

Of particular import in <u>Calhanas</u> was <u>N.J.S.A.</u> 5:14-6, a provision which, in essence, immunizes a roller rink from injuries sustained by skaters arising from "inherent risks of roller skating, insofar as [those] risks are obvious and necessary." <u>Calhanas</u>, <u>supra</u>, 292 <u>N.J. Super.</u> at 521 (quoting <u>N.J.S.A.</u> 5:14-6). In construing that provision, we observed that a "similar standard was enunciated in [<u>Crown</u>, <u>supra</u>, 136 <u>N.J.</u> at 508]." <u>Calhanas</u>, <u>supra</u>, 292 <u>N.J. Super.</u> at 521.

Upon concluding that summary judgment was improvidently granted on the record facts in <u>Calhanas</u>, we reasoned that the child

> who collided with Manuel Calhanas had been skating <u>in an obviously reckless manner</u> for some minutes before the collision. They both testified that the child was skating at a high rate of speed with no one accompanying him, weaving in front of people and cutting across the rink, rather than proceeding around the rink in a circular fashion as he should have.
>
> [<u>Id.</u> at 522 (emphasis added).]

Although perhaps illustrative of a roller rink's potential liability that can stem from a child's recklessness under the roller rink statute, Calhanas does not resolve the present question of a minor's own common law duties in the context of a youth sporting game. Rather, Calhanas only signifies that the reckless acts that may give rise to tort liability cannot be acts which are "inherent" in a recreational activity. Notably, the minor who caused the accident in Calhanas was not identified or sued. Id. at 517-18

Cases in other states have applied a comparable recklessness standard, or its equivalent, in ascertaining whether a minor can be liable for personal injuries that he or she inflicts during a youth sporting activity. See, e.g., Keller v. Mols, 509 N.E.2d 584, 584-86 (Ill. App. Ct. 1987) (holding that a fourteen-year-old plaintiff injured by a thirteen-year-old defendant in a floor hockey game on a neighbor's patio was precluded from recovery for injuries on a simple negligence theory); Ramos v. City of Countryside, 485 N.E.2d 418, 418-20 (Ill. App. Ct. 1985) (concluding that a fourteen-year-old boy who struck an eight-year-old boy in the eye with a ball while playing the game of "bombardment" could not be held liable for the younger boy's injury on a theory of negligence, since both youths were participating in a sporting

A-2771-13T3

event); <u>Leonard ex rel. Meyer v. Behrens</u>, 601 <u>N.W.</u>2d 76, 81 (Iowa 1999) (applying the recklessness standard to two fifteen-year-old litigants for injuries occurring during their paintball game); <u>Kabella v. Bouschelle</u>, 672 <u>P.</u>2d 290, 294 (N.M. Ct. App. 1983) (holding that a minor plaintiff could not sue another minor for mere negligence for injuries sustained in an informal game of tackle football; a viable claim must be predicated upon reckless or intentional conduct); <u>Marchetti v. Kalish</u>, 559 <u>N.E.</u>2d 699, 703-04 (Ohio 1990) (applying a recklessness standard to a fifteen-year-old defendant who collided with a thirteen-year-old plaintiff causing a broken leg).

Distilling these authorities to a cohesive rule of law to apply when, as here, a minor injures another minor in a sporting activity, we adopt a "double-layered" approach. The two layers of that analysis are as follows: (1) whether the opposing player's injurious conduct would be actionable if it were committed by an adult, evaluating whether there is sufficient proof of the defendant player's intent to inflict bodily injury or recklessness; and, if so, (2) whether it would be reasonable in the particular youth sports setting to expect a minor of the same age and characteristics as the defendant to refrain from the injurious physical contact.

This dual-tiered approach captures the essence of two strands of law that we have previously outlined. Moreover, the approach reflects the long-standing public policies that disfavor the unfettered tort liability of fellow sporting participants, and also curtail the tort liability of children who cause third parties to sustain personal injuries.

We can readily take judicial notice that children, particularly younger children, often need years of training, coaching, and experience to learn and adhere to the rules of a competitive sport. Children will inevitably commit fouls in sporting activities out of inexperience, youthful exuberance, lack of self-discipline, clumsiness, immaturity, frustration, or some combination of those traits.[10] Their propensity to make physical and mental errors is compounded in sports such as lacrosse, which have complicated rules and which inherently involve a high degree of physical contact with opposing players. It would be unfair to hold children who engage in such sporting

---

[10] This principle is recognized in the U.S. Boys Youth Lacrosse Rules. Under the paragraph titled "Violent Collisions," the Rules provide that "[s]ome body contact is permitted at all levels of boys' youth lacrosse, with progressively more age-appropriate contact permitted as players become more physically mature and learn proper checking techniques." U.S. Lacrosse, 2014 U.S. Lacrosse Boys Youth Rules, http://www.uslacrosse.org/portals/1/documents/pdf/participants/players/2014-boys-youth-rules.pdf.

activities to the same expectations and standards of conduct as adult athletes.

Nor should the prospect of a lawsuit crop up every time that a referee calls a foul on a child who is learning how to play the game. The law should not unduly discourage our youths from taking advantage of opportunities through organized sports to appreciate and cultivate the virtues of teamwork and physical conditioning.

That said, we are cognizant of the serious and sometimes long-lasting injuries that can be suffered by children when they take part in sporting activities with their peers. For instance, we are well aware of the heightened public attention that has recently been focused upon concussions and similar injuries to young athletes. In light of those legitimate safety concerns, we by no means intend by this opinion to endorse or promote a laissez-faire attitude that is oblivious to the risks of such injuries. Nor do we overlook the efforts of coaches, parents, referees, and equipment manufacturers who are striving to make youth sports safer.

All we have done in this opinion is to attempt through our double-layered analysis to integrate established rules of law, rules that already regulate the liability of adult sport participants and of child defendants in tort cases. If new or

different liability principles would be preferable, the Legislature is free, of course, to enact them.

Applying the well-settled general legal principles here, and viewing the record in a light most favorable to plaintiffs, we are satisfied that the trial court correctly granted summary judgment to the defendant minor in this case. G.A. was only eleven years old when this incident took place. He was playing in a program level designed for less-experienced or less-proficient lacrosse players of his age. Although he may well have committed a foul by approaching C.J.R. in the manner that has been described, that mistake must be considered in context. The game was apparently close, and time was running down. G.A.'s team could not tie or win the game unless it got control of the ball back. There was no proof of any pre-existing enmity between C.J.R. and G.A. earlier in the game. In fact, C.J.R. did not even realize at the time of the collision who the opposing player was that hit him.

Even assuming, for the sake of argument, there could be a triable issue of recklessness here if the boys had been adults, we are satisfied that there is no need to try this case when one necessarily considers the second layer of analysis that takes into account their status as minors. A reasonable jury could not find the facts of this particular case here rising to a

level of recklessness that would or should make this eleven-year-old lacrosse novice monetarily liable for his misguided actions on the field. Although C.J.R.'s injury is regrettable, it is one of those unfortunate occasional consequences of minors playing in a rough-and-tumble sport.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                    A-2771-13T3